# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Wisconsin

In the Matter of the Search of:

Username: mr._111em_fmr )
User ID: 2316477393 )
which is stored at premises owned, maintained, controlled, or )
operated by Instagram, LLC, a company that is owned by )
Facebook, Inc. and headquartered in Menlo Park, California )

Case No. _18-M-27_

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

■ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Deputy Brian Nodes, U.S. Marshals Service
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _Feb. 15, 2018_

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable David E. Jones , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian Nodes, a Deputy with the U.S. Marshals Service, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.     I make this affidavit in support of an application for a search warrant for information associated with account name mr._111em_fmr with Instagram user id: 2316477393] (the "SUBJECT ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Instagram, LLC, ("Instagram") a social-networking company owned by Facebook, Inc. and headquartered in San Francisco, California.   The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), to require Instagram to disclose to the government records and other information in its possession, including the contents of communications, pertaining to the subscriber or customer associated with the SUBJECT ACCOUNT.

2.     I am a Deputy with the U.S. Marshals Service, and have been since April 2009.  As part of my duties, I investigate violations of federal and state laws, including those relating to fugitives.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.     This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

4.     Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846 have been committed by Marlon SIMON. There is also probable cause to search the SUBJECT ACCOUNT for information described in Attachment A for evidence of these crimes and items to be seized listed in Attachment B.

## Probable Cause

6.     Since November of 2015, special agents from the Wisconsin Department of Justice, Division of Criminal Investigation, have been conducting an investigation regarding the trafficking of large quantities of cocaine and crack cocaine in the Milwaukee area, which has been sourced from the Los Angeles, California area.

2

7.     In July of 2017, case agents met with a Confidential Source (CS #1). CS #1 admitted to selling substantial amounts of cocaine in the Milwaukee area since the summer of 2015. CS #1 stated that his/her sources of cocaine were from California and that CS #1 and his/her co-conspirators traveled out to California to obtain kilograms of cocaine from the sources of supply on more than 5 occasions and on each occasion they would obtain between 2-4 kilograms of cocaine. CS #1 stated that s/he and his/her coconspirators in Wisconsin would typically rent a "Sprinter" type multiple passenger van and travel to California to pick up kilograms of cocaine. Additionally, on several occasions the California source of supply would travel to Wisconsin or send a courier to Wisconsin to deliver the kilograms of cocaine. Since 2015, CS #1 estimated that s/he had purchased approximately 20-30 kilograms of cocaine from his/her California source of supply. CS #1 stated that his/her California sources of supply would charge $30,000 - $33,000 per kilogram of cocaine and some of the kilograms of cocaine would be fronted. CS #1 stated that the last time s/he was in California to obtain kilograms of cocaine from the source of supply was on April 20, 2017, which was corroborated by airline records and phone location data.

8.     CS #1 also stated that when s/he first met the California source of supply in the summer of 2015, the source of supply was present in Wisconsin selling cocaine. CS #1 stated that his California sources are nicknamed "G" and "H." CS #1 positively identified Marlon Jamir SIMON (B/M, DOB: 07/15/1984) as the individual s/he knew as "G." CS #1 stated that "H's" real first name could possibly be "Harvey" or "Henry" and described "H" as being a black male 50-52 years old, 5'10" with a slim build and

3

who drives a Cadillac SUV. CS #1 stated that "G" and "H" were associated with Blood Street Gang Members in California. Case agents subsequently identified "H" as Harvey R. HIXON (B/M, DOB: 01/27/1961) and CS #1 positively identified Harvey R. HIXON as the individual s/he knew as "H."

9.      CS #1 stated that in the summer of 2015 during a trip to California to obtain kilograms of cocaine, SIMON instructed CS #1 to contact him on telephone number 747-243-1221. Since that time, CS #1 has been contacting SIMON on 747-243-1221 to obtain kilograms of cocaine. At that meeting, SIMON and HIXON also provided CS #1 with a flip phone with a California phone number, with area code 747, and SIMON and HIXON also obtained a flip phone with a Milwaukee phone number, with the 414 area code. CS #1 stated in order to contact SIMON or HIXON s/he would call SIMON and "H's" Milwaukee number and hang up. CS #1 stated that his/her calling of the Milwaukee number flip phone was the signal for SIMON or HIXON to call CS #1's California number 747-243-1221. CS #1 stated that s/he would not speak to SIMON or HIXON on the Milwaukee area code (414 area code number), but rather using the Milwaukee area code number was simply a way to give the appearance of a local phone call and attempt to evade law enforcement because no out of state numbers would appear on CS #1's telephone records. CS #1 stated that when s/he needed cocaine CS #1 would call the "414" number hang up and then call phone number 747-243-1221 from the California flip phone and state "It's a jungle out there" during the course of the conversation with "G" (SIMON) or "H" (HIXON). CS #1 stated that this

phrase was the code that CS #1 and his coconspirators in Milwaukee were out of cocaine and needed another shipment of cocaine from SIMON and HIXON.

10.     For several reasons, case agents believe that CS #1 is reliable and credible. First, CS #1 has been providing continuous information since July of 2017. Second, the information CS #1 has provided is substantially against CS #1's penal interest. Third, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information has been corroborated through independent investigation, including through surveillance and law enforcement reports. For example, CS #1 informed case agents of travel to California on numerous occasions, which was corroborated through subpoenaed rental car records, airline records, electronic surveillance, and confidential source reporting. CS #1 has felony convictions for possession of a controlled substance, possession of THC, battery, possession with intent to deliver cocaine, and second or subsequent possession of THC, and fleeing and eluding officers. CS #1 is cooperating for consideration on potential federal drug trafficking charges. Finally, CS #1 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents consider CS #1 to be reliable.

11.     In July of 2017, acting under the direction and supervision of case agents, CS #1 placed a recorded call to HIXON on telephone number 747-243-1221. During the conversation, CS #1 explained to HIXON that they still had cocaine left and they would call HIXON when they were ready to get more. CS #1 also expressed to HIXON that

the next shipment of cocaine had to be of good quality because they were having a hard time selling the current shipment of cocaine because it was not good quality. HIXON indicated that they would work it out. CS #1 indicated to HIXON that at some point CS #1 wanted to come and visit (in Los Angeles). HIXON indicated that CS #1 should come and visit.

12. In September of 2017, CS #1, acting under the direction and control of case agents, placed a series of recorded calls to HIXON at 747-243-1221. CS #1 was able to make contact with HIXON and they had a discussions concerning the quality of past cocaine shipments. CS #1 also indicated to HIXON that s/he had located a different supplier and HIXON asked CS #1 what he could do to fix things and indicated that he would be willing to lower his prices if necessary. CS #1 indicated that he would travel to California so they could discuss things in person.

13. In July of 2017, agents interviewed CS #2. CS #2 admitted to trafficking substantial amounts of cocaine in the Milwaukee area for about a year and half. CS #2 identified the 1,847 grams of cocaine recovered during a search warrant of his/her residence as being cocaine purchased from his California suppliers. CS #2 stated that s/he was supplied cocaine by individuals from California and further stated that the suppliers would bring the cocaine directly Milwaukee and sometimes CS #2 would travel to California and pick it up. CS #2 stated that he knows the suppliers by the nicknames of "G" and "H." CS #2 positively identified Marlon Jamir SIMON (b/m, DOB: 07/15/1984) as being the individual s/he knows as "G." CS #2 described "H" as being an older black male, 50 years old, 5'8"-5'10," short hair, 200 lbs.

6

14.     CS #2 stated the first time SIMON and HIXON sold cocaine to CS #2 and his/her coconspirator, s/he was not present during the actual transaction but was outside of a residence near 73rd and Center. CS #2 stated that his co-conspirator conducted the transaction and the cocaine was then brought to CS #2's residence.   CS #2 stated after this initial deal in Milwaukee CS #2 and his co-conspirator would purchase cocaine from SIMON or HIXON approximately every 2 ½ months. CS #2 stated that each purchase would be at least 2 kilograms.

15.     CS #2 stated that when the cocaine shipments were delivered to Milwaukee, SIMON and HIXON would send a courier to deliver the cocaine and each time the courier would arrive in an Uber.  CS #2 stated that the last time CS #2 received cocaine from SIMON and HIXON was in June of 2017 and that they had received approximately 1.5 kilograms of cocaine for approximately $49,500.  CS #2 stated that the courier arrived at his residence in Milwaukee in an Uber and he paid the driver of the Uber $240. CS #2 stated that the courier brought the cocaine inside of the residence in a large backpack.  CS #2 stated that they gave the courier a portion of the money for the transaction. CS #2 stated that s/he and his/her co-conspirator deposited the rest of the money into Wells Fargo accounts. CS #2 stated that SIMON and HIXON provided CS #2 with the names and account numbers to make the deposits. CS #2 stated that s/he conducted a couple of deposits for payment and then stopped because CS #2 was afraid s/he might get caught.

16.     CS #2 stated that s/he and his/her coconspirators travelled to California on 5 to 6 occasions to pick up cocaine from California. CS #2 stated that they would

7

pick up 1-5 kilograms of cocaine on each trip. CS #2 stated that when they purchased cocaine SIMON and HIXON would front some of the cocaine, s/he would pay SIMON, and HIXON the balance after CS #2 and his coconspirators in Wisconsin sold all of the cocaine. CS #2 stated that when CS #2 received the cocaine s/he would break it down to ounce, half-ounce, or one-eighth of an ounce quantities. CS #2 stated that s/he and his/her coconspirator would typically pay $33,000 per kilogram. CS #2 stated when they were running low on cocaine CS #2's coconspirator would call the supplier and tell him, "It's a jungle out there," which meant that they were ready to be re-supplied with cocaine. CS #2 stated that s/he did not know SIMON or HIXON's phone numbers.

17. For several reasons, case agents believe that CS #2 is reliable and credible. First, CS #2 has been providing continuous information since July of 2017. Second, the information provided by CS #2 is consistent with evidence obtained elsewhere in this investigation where CS #2 was not utilized, and substantial portions of CS #2's information has been corroborated through independent investigation, including through surveillance and law enforcement reports. For example, CS #2 informed case agents of travel to California, which was corroborated by subpoenaed rental car records and electronic surveillance. For example, CS #2 also provided case agents with banking deposit information at banks, which was corroborated by bank records. CS #2 has felony convictions for delivery of cocaine and delivery of marijuana. CS #2 is cooperating for consideration on potential federal drug trafficking charges. For these reasons, case agents consider CS #2 to be reliable.

18. On September 20, 2017, case agents obtained a search warrant to obtain location information for HIXON's phone, 747-243-1221. In September of 2017, acting under the direction and supervision of case agents, CS #1 traveled to Los Angeles, California area to arrange to meet with HIXON regarding their drug distribution relationship, including future purchases of kilograms of cocaine. CS #1 placed recorded calls to HIXON at phone number 747-243-1221 and 414-213-0475 to arrange for the meeting with "H." Case agents reviewing the location information for HIXON's phone, 747-243-1221, revealed that the phone was initially located in the area 8328 Topeka Drive, Northridge, CA. As HIXON traveled closer and closer the meet location, case agents observed corresponding location information for the 747-243-1221 phone number. HIXON arrived at the pre-arranged meet location in a gray Toyota Prius with California plate# 5PLS318. Case agents conducted a check with the California Department of Transportation regarding plate 5PLS318, which revealed that the vehicle listed to Ahlexhys Hixon of 8437 Cedros Avenue, #107, Panorama City, CA.

19. During the course of the meeting, which was audio and video recorded, HIXON stated that the poor quality cocaine was obtained by others and that in the future, HIXON would check the quality of cocaine before distributing it to CS #1. HIXON further stated that, when the "boat" arrived, HIXON's paper would get mixed up with the other paper, referring to the cocaine. CS #1 complained to HIXON about the quality of cocaine and stated that s/he and CS #2 could go elsewhere (referring to Chicago) for the cocaine and that obtaining the cocaine was not a problem. CS #1 discussed high prices and HIXON stated that he could lower the prices. During the

course of the conversation, HIXON handed CS #1 a plastic bag containing a sample of cocaine and CS #1 stated that the cocaine sample looked nothing like the previous cocaine obtained from HIXON. During the conversation, CS #1 also mentioned "Valentine's Day," which was a reference to a bad shipment of cocaine. HIXON took responsibility for the poor quality of cocaine and HIXON told CS #1 that he had checked it and that it looked good. CS #1 stated that s/he and CS #2 was looking for "good work," referring to the trafficking of good quality of cocaine. CS #1 complained about the taste of the cocaine and described how cocaine customers would complain about the taste. HIXON stated he never heard about drug users complaining about taste and HIXON acknowledged that after checking the cocaine, some of the cocaine sold to CS #1 was "fucked up." During the meeting with HIXON, CS #1 called CS #2 and s/he also spoke with HIXON. CS #2 and HIXON spoke about the quality of cocaine and past cocaine transactions. HIXON explained that the last delivery of cocaine was a "rush job." CS #1 informed CS #2 that HIXON provided a sample that looked good.

20. HIXON mentioned that the previous night HIXON had spoken to SIMON in attempts to meet up the next day with HIXON and CS #1. HIXON also discussed how to transport the cocaine to CS #1. CS #1 discussed drug trafficking methods deployed by SIMON in the past. CS #1 further stated that HIXON provided him/her with a cellular phone bearing phone number 626-549-9786. HIXON told CS #1 that he was going to turn off phone number 747-243-1221 and that his new number is 626-455-8029. HIXON stated that CS #1 should call 626-455-8029 when CS #1 is ready to

conduct business. CS #1 told HIXON that s/he would call him when s/he was ready to receive the next shipment of cocaine.

21.     Case agents met with CS #1 who turned over the sample of cocaine received from "H." Case agents subjected a sample of the cocaine to the Nark II Field test and received a positive result for cocaine base. Case agents received a weight of approximately 1.0 grams with packaging materials.

22.     In early October of 2017, CS #1, acting under the direction and control of case agents, placed a recorded call to HIXON and during this case, CS #1 stated, in coded language, that s/he was ready to receive another cocaine shipment from HIXON and SIMON. CS #1 spoke with HIXON regarding the status of the cocaine shipment and HIXON indicated that he was waiting on "G" (SIMON) to obtain the cocaine. On October 21, 2017, CS #1 received a phone call from HIXON on 414-213-0475. HIXON indicated to CS #1 that the shipment of cocaine would arrive in Wisconsin on Monday or Tuesday (October 23 or 24) and that he would probably be in Wisconsin on Monday or Tuesday. During the call, HIXON asked CS #1 if he had enough money for three (referring to 3 kilograms of cocaine). CS #1 told HIXON that he had enough for 3 kilograms of cocaine. HIXON indicated that he would front the fourth kilogram to CS #1. HIXON advised CS #1 that the phone he gave him (626-455-8029) was off but he paid the bill and it should be back on. HIXON advised CS #1 that s/he should keep the phone with him/her because he will call soon with additional details.

23.     On October 26, 2017, CS #1 received a call from HIXON regarding the shipment of cocaine. CS #1 and HIXON asked if CS #1 had converted the money into

11

larger bills so it would be easier to handle. HIXON stated that the cocaine shipment would probably arrive in Milwaukee on Saturday (October 28). HIXON stated that CS #1 should not have the money on hand until tomorrow Friday (October 27).

24.     On October 27, 2017 at approximately 3:30 p.m., CS #1 received a phone call from HIXON stating that the cocaine shipment was with an individual CS #1 knows as "cousin Twain." CS #1 had prior contacts with "cousin Twain" and identified him as Antoine Williams. CS #1 indicated that Williams resided in a tan residence on the corner located at N. 70th Street and W. Hampton Avenue, in the City of Milwaukee. CS #1 showed case agents a photograph of Antoine Williams from Instagram and case agents compared the picture to the WI Department of Transportation photograph of Antoine L. Williams (M/B, 08-21-1984) and confirmed it was the same subject. The address listed on Williams' driver's license was 4777 N. 70th Street, Milwaukee, WI.

25.     CS #1 subsequently received a call from HIXON and HIXON stated that "cousin Twain" was currently in the area of "70th and Hampton" and HIXON would advise when "cousin Twain" was en route to CS #1's location.

26.     Case agents established surveillance at the residence located at 4777 N. 70th Street. At approximately 4:30 p.m., case agents observed a male black subject exit the east door of the residence at 4777 N. 70th St and enter the driver's side door of a white Chevrolet Malibu with IL license plate of AK15098, which was parked to the east of the residence. At approximately the same time, CS #1 received a phone call from HIXON indicating that "cousin Twain" was en route to his location. At approximately, 5:10 p.m., a white Chevrolet Malibu with IL license plate AK15098 drove north past the

12

location of CS #1, that is, the meet location. As the vehicle drove past slowly, CS #1 was on the phone with HIXON who indicated that "cousin Twain" was at the meet location. The white Chevrolet Malibu with IL license plate AK15098 then continued driving northbound past the meet location. Surveillance units followed the white Malibu and at approximately 5:20 p.m., Milwaukee Police Department marked units attempted to stop the white Chevrolet Malibu with IL license plate of AK15098, in the 2700 block of Elder Wallis Street.

27. The suspect vehicle fled from the marked police vehicles and during the pursuit, law enforcement briefly lost visual surveillance of the vehicle. Shortly thereafter, case agents recovered the white Chevrolet Malibu with IL license plate AK15098 at 3604 N. 37th Street. The white Chevrolet Malibu with IL license plate AK15098 was abandoned and the driver apparently fled on foot. Case agents observed in plain view a cell phone on the driver's seat and a Glock pistol with an extended magazine on the floorboard in front of the front passenger seat. The driver's door of the white Chevrolet Malibu with IL license plate AK15098 was unlocked and case agents conducted a protective, cursory search of the vehicle and recovered an Apple I-phone, model A1634, FCC-ID BCGE2944A with a brown case, from the driver's seat, a Glock pistol with an extended magazine from the floorboard in front of the front passenger's seat and a receipt in the name of Antoine L. Williams.

28. Case agents maintained surveillance on the residence located at 4777 N. 70th Street. Case agents observed a light blue Honda sedan northbound on N. 70th Street driving at a high rate speed. The vehicle turned into an alley to the south of the

13

residence and case agents then observed a male black subject walking from the location of where the Honda vehicle parked. Case agents recognized the subject to be Antoine L. Williams and case agents identified themselves as police and ordered Williams to stop. Williams then fled on foot. During the foot pursuit, case agents observed Williams drop keys to the Honda vehicle, a cell phone that was damaged, and house keys. Upon arresting Williams, case agents recovered a substantial amount of cash and a WI Identification card from his person.

29. On October 27, 2017, case agents obtained a federal warrant for 4777 North 70th Street, Milwaukee, WI. A search of the residence revealed marijuana, MDMA, approximately one pound of methamphetamine, cellular phones, various documents, $11,610 in U.S. Currency, and two safety deposit box keys.

30. In December of 2017, case agents met with a confidential source (CS #3). CS #3 stated that he was introduced to "G" (SIMON) approximately three years ago and stated that G was involved in selling large amounts of cocaine. Specially, CS #3 stated that Simon initially brought one kilogram of cocaine to Milwaukee for sale; however, Simon would not personally bring the cocaine to Milwaukee. Rather he would take a flight from LA to Milwaukee and one of his couriers would bring the cocaine to CS #3. CS #3 stated that Simon bragged about having a private jet. CS #3 stated that Simon would front the cocaine to him/her and then after selling the cocaine he would have to bring Simon back $30,000. CS #3 stated that Simon would come to Milwaukee twice a month with cocaine and that he eventually moved up to 2-3 kilograms of cocaine per trip. CS #3 stated that CS #3 would deposit money from

cocaine sales in Wells Fargo bank accounts in increments of $8000 to pay Simon for the fronted kilograms of cocaine. CS #3 also stated that Simon brought cocaine to CS #3 for approximately 6 months (4-6 kilograms a month) for approximately six months until Simon went to jail. CS #3 stated that when Simon went to jail he received a call from an individual named "H" (identified as Hixon) and Hixon informed CS #3 that Simon was in jail and he turned over his drug dealing operation to him. CS #3 stated that he was not comfortable dealing with Hixon because he did not know him.

31.     CS #3 stated that he was contacted by Simon on Facebook indicating that Simon wanted to hook up with him again. In August of 2017, CS #3 travelled to CA to meet with Simon. Simon paid for CS #3's plane ticket to LA. During his time in LA, CS #3 met with Simon and Simon introduced CS #3 to Hixon and stated that Simon told him that he wanted CS #3 to deal with Hixon. Simon advised CS #3 that he was not really into selling cocaine and that he made much more money selling methamphetamine. CS #3 stated that Simon bragged about having stuff going on in different states. During his visit to Los Angeles, CS #3 stated that Hixon bought 4 Metro PCS cell phones and Hixon kept two of the phones and gave one phone to CS #3 and one phone to Simon. The three of them discussed sending cocaine to CS #3 during sometime in September of 2017. CS #3 stated that Hixon told him that he would be in contact with CS #3 on the phone that he (Hixon) purchased for CS #3.

32.     For several reasons, case agents believe that CS #3 is reliable and credible. First, CS #3 has been providing continuous information since December of 2017. Second, the information provided by CS #3 is consistent with evidence obtained

elsewhere in this investigation where CS #3 was not utilized, and substantial portions of CS #3's information has been corroborated through independent investigation, including through surveillance, confidential source reporting, and law enforcement reports. CS #3 has felony convictions for possession with intent to distribute THC (>1000-2500 grams), keeping a place of prostitution, possession with intent to distribute cocaine (<1-5g), and fleeing and eluding an officer. CS #3 is cooperating for consideration on potential federal drug trafficking and possession of a firearm during and in relation to a drug trafficking offense charges. For these reasons, case agents consider CS #3 to be reliable.

33.     On October 23, 2017, case agents obtained a federal criminal complaint and arrest warrant for SIMON. Case agents in the Los Angeles, California attempted to arrest SIMON in November of 2017 and it appeared that SIMON fled Los Angeles, California after the attempted controlled purchase of kilograms of cocaine on October 27, 2017. On January 27, 2017, SIMON was indicted by a grand jury sitting in the Eastern District of Wisconsin for various drug trafficking offenses including violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846. An arrest warrant remains pending for SIMON and he is considered a fugitive. Through my training and experience, I know that fugitives who use social media sites such as Instagram maintain relationships with family and friends through private messages along with posting and exchanging of pictures. Having access to view those messages and historical IP addresses often times provides crucial information that assists in locating fugitives.

16

34.    CS #2 had previously provided case agents with SIMON's Instagram page and Instagram user name for the SUBJECT ACCOUNT. Additionally, CS #3 stated that he was aware of SIMON's Instagram page and he followed him on Instagram and communicated directly with SIMON on Facebook messenger.  On January 26, 2018, case agents attempted to view SIMON's Instagram page.  Case agents were able to view the Instagram page profile picture; however, the rest of the Instagram page was blocked. Case agents compared SIMON's 2016 California Driver's License photograph to the profile picture on Instagram, and determined that SIMON is the person in the Instagram profile picture for the SUBJECT ACCOUNT.   On February 8, 2018, case agents sent a preservation request for SIMON's page to Instagram, the SUBJECT ACCOUNT, through the Law Enforcement Database Portal to preserve the content that has been posted on that page.

35.    From my review of publicly available information provided by Instagram about its service, including Instagram's "Privacy Policy," I am aware of the following about Instagram and about the information collected and retained by Instagram.

36.    Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com.  Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information.   Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

37. Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter. When posting or sharing a photo on Instagram, a user can add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a user made add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo); location information; and other information. A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos. In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram. Users can also "like" photos.

38. Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

39. Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. Instagram collects and maintains this information.

40. Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public.

18

Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

41. Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is, stop following them or block the, which prevents the blocked user from following that user.

42. Instagram allow users to post and share various types of user content, including photos, videos, captions, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram.

43. Instagram users may send photos and videos to select individuals or groups via Instagram Direct. Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

44. Users on Instagram may also search Instagram for other users or particular types of photos or other content.

45. For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

46. Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram. For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

47. Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

48. Instagram also collects other data associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information. Instagram also may communicate with the user, by email or otherwise. Instagram collects and maintains copies of communications between Instagram and the user.

49. On February 8, 2018, I served Instagram with a preservation request pursuant to 18 U.S.C. § 2703(f), requiring Instagram to preserve all information associated with the SUBJECT ACCOUNT.

50. As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

20

In my training and experience, an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram account at a relevant time. Further, Instagram account activity can show how and when the account was accessed or used. For example, as described herein, Instagram logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to SIMON's drug trafficking operation and travel from California to Wisconsin to delivery controlled substances. Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to SIMON's drug trafficking and may help to identify his current whereabouts, as he is a fugitive, which may lead to his arrest. Additionally, Instagram builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner. Last, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the

offense under investigation. For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

51. Based on the information above, the computers of Instagram are likely to contain all the material described above with respect to the SUBJECT ACCOUNT, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

### Information To Be Searched And Things To Be Seized

52. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular Title 18, United States Code, Sections 2703(a), (b)(1)(A), and (c)(1)(A), by using the warrant to require Instagram to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### Conclusion

53. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of

violations, or attempted violations, of Title 21 U.S.C. § 846, 841(a)(1) and 841(b)(1)(A) may be located in the SUBJECT ACCOUNT described in Attachment A.

54. This Court has jurisdiction to issue the requested warrant to Instagram because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

55. Based on the forgoing, I request that the Court issue the proposed search warrant.

56. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Because the warrant will be served on Instagram, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

23

24

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Instagram profile:

Username: mr._111em_fmr

User ID: 2316477393

that is stored at premises owned, maintained, controlled, or operated by Instagram, LLC, a company that is owned by Facebook, Inc. and headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

**I.     Information to be disclosed by Instagram, LLC**

To the extent that the information described in Attachment A is within the possession, custody, or control of Instagram, LLC, including any messages, records, files, logs, or information that have been deleted but are still available to Instagram, LLC, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Instagram, LLC is required to disclose the following information to the government for each account listed in Attachment A:

   a.    All identity and contact information for the account, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

   b.    All past and current usernames associated with the account;

   c.    The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

   d.    All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

   e.    All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

   f.    All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

   g.    All communications or other messages sent or received by the account;

   h.    All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content;

   i.    All photographs and images in the user gallery for the account;

j.   All location data associated with the account, including geotags;

k.   All data and information that has been deleted by the user;

l.   A list of all of the people that the user follows on Instagram and all people who are following the user (*i.e.*, the user's "following" list and "followers" list), as well as any friends of the user;

m.   A list of all users that the account has "unfollowed" or blocked;

n.   All privacy and account settings;

o.   All records of Instagram searches performed by the account, including all past searches saved by the account;

p.   All information about connections between the account and third-party websites and applications; and,

q.   All records pertaining to communications between Instagram, LLC and any person regarding the user or the user's Instagram account, including contacts with support services, and all records of actions taken, including suspensions of the account.

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) involving SIMON since July 1, 2015, including, for each username identified on Attachment A, information pertaining to the following matters:

(a) Evidence indicating how, when, and where the Instagram account was accessed or used, including information identifying the type of device used to access the account and the location of that device;

(b) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(c) All communications stored in the account, whether sent from or received in the account, including any "chat or messaging or other

2

communications," as well as such communications held in a "Deleted" status;

(d) All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

(e) All address books, contact lists, friends lists, buddy lists, or any other similar compilations of personal contact information associated with the accounts;

(f) All records or other information regarding the identification of the account, including full name, physical address, mailing address, residential or business address; other contact or identifying information such as telephone numbers and other identifiers; including subscriber names, user names, screen names or other identities associated with the account; records of session times and durations, the date on which the accounts were created, the length of service, the types of service utilized, the IP address used to register the accounts, log-in IP addresses associated with session times and dates, account statuses, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number).

3